IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION

| | | |
|---|---|---|
| MILDRED ROSENTHAL, Derivatively and On Behalf of Nominal Defendant AMERICREDIT CORP., PLAINTIFF, | ) ) ) ) ) | |
| v. | ) ) | Case No. |
| CLIFTON H. MORRIS, JR., DANIEL E. BERCE, MICHAEL R. BARRINGTON, and EDWARD H. ESSTMAN, DEFENDANTS, | ) ) ) ) ) ) | 4-03CV-141-A |
| and | ) ) | |
| AMERICREDIT CORP., NOMINAL DEFENDANT. | ) ) ) | |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff alleges on information and belief, except as to those allegations that pertain to Plaintiff, which are alleged on personal knowledge, as follows:

## NATURE OF THE CASE

1.    This is a shareholders' derivative action brought pursuant to the Federal Rules of Civil Procedure 23.1 for the benefit of nominal defendant AmeriCredit Corp. ("AmeriCredit" or the "Company") against its directors, defendants Clifton H. Morris, Jr., Daniel E. Berce, Michael R. Barrington and Edward H. Esstman (hereinafter, the "Individual Defendants"), seeking to remedy the Individual Defendants' breaches of fiduciary duty, including their knowing violations of Generally Accepted Accounting Principles ("GAAP") and knowing violations of federal and state securities laws, acts of bad faith, and other breaches of fiduciary duty.

1

I.\AmeriCredit\Derivative\OriginalDerivativeComplaint.doc

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (1). Plaintiff and all defendants are residents and citizens of different states.  The amount in controversy between plaintiff and the defendants exceeds $75,000.00, exclusive of interest and costs.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

3.     Venue is proper in this district.  Many of the acts and transactions giving rise to the violations of law complained of herein, including the decision to engage in the activities which gave rise to the acts underlying the breaches of fiduciary duty and the preparation and dissemination to the investing public of false and misleading information due to the nondisclosure of conduct occurring in this district.  AmeriCredit maintains its headquarters and executive offices at 801 Cherry Street, Suite 3900, Ft. Worth, Texas.  Many of the defendants are also believed to reside within this district.

## PARTIES

4.     Plaintiff, Mildred Rosenthal, is a citizen of Florida and was at all material times and continues to be a shareholder of nominal defendant AmeriCredit.

5.     Nominal defendant AmeriCredit is incorporated pursuant to the laws of Texas. The Company is a sub-prime lender engaging in the automobile finance business.  The Company will also purchase auto finance contracts without recourse from auto dealers and make loans directly to consumers to buy new and used vehicles.  It targets consumers who typically are unable to obtain financing from traditional sources due to blemished credit histories. AmeriCredit will then convey the loans to special purpose trusts which issue bonds that are secured by the loans in the trusts (a/k/a asset-backed securitization trusts).  Cash flow from the

1 \AmeriCredit\Derivative\OriginalDerivativeComplaint doc

loans are retained in the trusts in restricted accounts – as reserves against loan defaults and unavailable to AmeriCredit – until the reserves reach a certain amount. Payments on the securitizations are guaranteed by a bond insurer. If AmeriCredit cannot execute securitization transactions on a regular basis, it will not have enough funds to meet its liquidity needs, including possibly discontinuing loan origination activities. This spiraling down effect, if unabated, would cause the Company to eventually default on its obligations and eventually go out of business.

6.     The Company has known that it must utilize a securitization trust structure involving the use and purchase of a financial guaranty insurance policy or bond in order to execute a transaction acceptable to the financial markets. Retaining the services of a financial guaranty company at a competitive rate is therefore crucial to the Company.

7.     The following Individual Defendants were members of the Company's Board of Directors and controlled the Board at times relevant to this Complaint:

(a)     Defendant Clifton H. Morris, Jr. ("Morris") has been the Chairman of the Board of Directors of AmeriCredit since 1988 and was CEO of AmeriCredit from May 1988 to July 2000. He also served as President from May 1998 until April 1991 and from April 1992 to November 1996. Mr. Morris' reported compensation from AmeriCredit for Fiscal Year 2002 was in excess of $1.4 million, a majority of which was based on a performance bonus approved by the Board of Directors.

(b)     Defendant Daniel E. Berce ("Berce") has been Vice Chairman and CFO of AmeriCredit since November 1996 and has served as a member of AmeriCredit's Board of Directors since 1990. He also served as Executive Vice President, Chief Financial Officer and Treasurer from November 1994 through present. As Chief Financial Officer, Berce is

1 \AmeriCredit\Derivative\OriginalDerivativeComplaint doc

responsible for the representations and financial information in the SEC filings. In 1975, the SEC issued new instructions for Form 10-Q quarterly reports, requiring Forms 10-Q to be signed by the chief financial officers or chief accounting officers of companies to emphasize their responsibility for the financial data included therein. Defendant Berce signed AmeriCredit's Forms 10-Q for each quarter of 1999, 2000 and 2001, and Forms 10-K for years ended December 31, 2000 and December 31, 2001. Berce is believed to be a citizen of Texas. Mr. Berce's reported compensation from AmeriCredit for Fiscal Year 2002 was in excess of $2.5 million, the majority of which was based on a performance bonus approved by the Board of Directors.

(c)    Defendant Michael R. Barrington ("Barrington") has been Vice Chairman, President and Chief Operating Officer of AmeriCredit since November 1996, Chief Executive Officer since July 2000, and a Director of AmeriCredit since 1990. Mr. Barrington's reported compensation from AmeriCredit for Fiscal Year 2002 was in excess of $2.6 million, the majority of which was based on a performance bonus approved by the Board of Directors.

(d)    Edward H. Esstman ("Esstman") has been a director of AmeriCredit since 1996. He has been Vice Chairman since August 2001 and previously was Executive Vice President, Dealer Services and Co-Chief Operating Officer from October 2000 to August 2001, Executive Vice President, Dealer Services from October 1999 to October 2000, Executive Vice President, Auto Finance Division from November 1996 to October 1999 and Senior Vice President and Chief Credit Officer from November 1994 to November 1996.

## DUTIES AND RESPONSIBILITIES OF INDIVIDUAL DEFENDANTS

8.      Each Individual Defendant, because of his position as a director of AmeriCredit, owed fiduciary duties to the Company and its shareholders in connection with its operations, management and direction.

9.      To discharge these duties, the Individual Defendants were required, among other things to:

(a)      Manage, conduct, supervise and direct the business affairs of AmeriCredit in accordance with applicable state and federal law and rules and regulations and the charter and bylaws of AmeriCredit;

(b)      Neither violate nor permit any officer, director, agent or employee of AmeriCredit to violate applicable state laws, federal laws, rules, regulations or Company charter or bylaws;

(c)      Establish and maintain systematic and accurate books and records of the business and affairs of AmeriCredit and procedures for the reporting of the business and affairs to the Board of Directors, and periodically investigate, or cause independent investigation to be made of, said books and records;

(d)      Maintain and implement an adequate and functioning system of internal financial and accounting controls, such that AmeriCredit's financial statements and information would be accurate;

(e)      Exercise supervision over the public statements made and/or issued to the securities markets relating to AmeriCredit;

(f)      Remain informed as to the status of AmeriCredit's business, conditions, practices and operations, and upon receipt of notice or information of imprudent or unsound

5

practices or operations, to make a reasonable inquiry in connection therewith, and to take steps to correct such practices or operations and make such disclosures as are necessary to comply with state and federal securities laws; and

(g)     Supervise the preparation and filing of any audits, reports or other information required by law by AmeriCredit, and examine an devaluate any reports of examinations, audits or other financial information concerning the financial affairs of AmeriCredit, and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

10.     The members of AmeriCredit's Board, including Morris, Berce, Barrington and Esstman had the responsibility to insure that the financial statements of the Company were based upon accurate financial information about the Company, and that those financial statements were properly prepared.  Furthermore, the Defendants had the responsibility to, *inter alia*:

(a)     consult with the Company's independent auditors with respect to their audit plans;

(b)     review the independent auditors' audit report and the accompanying management letter;

(c)     consult with the independent auditors with regard to financial reporting; and

(d)     consult with the independent auditors with regard to the adequacy of internal controls.

**FACTUAL ALLEGATIONS**

6

11.    On or about February 19, 2003, AmeriCredit began to be inundated with securities fraud lawsuits filed against the Company and certain officers and directors. The purported class period of the securities cases (the "Class Period") commences on April 14, 1999. To date, there are at least ten (10) such lawsuits on file.

### Defendants' Misleading Statements

12.    On April 14, 1999, the first day of the Class Period, AmeriCredit distributed a press release titled "AmeriCredit Corp. Announces Record Third Quarter Operating Results And Expansion Of Credit Facilities." The press release, touting "record third quarter operating results," states in part:

**AmeriCredit Corp. Announces Record Third Quarter Operating Results And Expansion Of Credit Facilities**

FORT WORTH, Texas--April 14, 1999--Americredit Corp. (NYSE:ACF) today announced record net income of $19,505,000, or $0.29 per share, for its third fiscal quarter ended March 31, 1999, versus earnings of $13,258,000, or $0.20 per share, for the quarter ended March 31, 1998. On a comparative basis, net income increased 47% and earnings per share rose 45%.

For the nine months ended March 31, 1999, AmeriCredit reported record net income of $52,363,000, or $0.78 per share, versus earnings of $35,400,000, or $0.55 per share, for the nine months ended March 31, 1998, representing an increase of 48% in net income and an increase of 42% in earnings per share.

Automobile loan purchases were $766,778,000 for the third quarter of fiscal 1999, an increase of 60% over loan purchases of $480,482,000 for the third quarter of fiscal 1998. For the nine months ended March 31, 1999, automobile loan purchases were $1,990,893,000, 69% higher than loan purchases of $1,176,734,000 for the nine months ended March 31, 1998.

AmeriCredit's managed auto receivables totaled $3,553,208,000 at March 31, 1999, an increase of 85% since March 31, 1998. The Company opened 3 branch locations in its third fiscal quarter bringing the total number of branch locations to 168 in 41 states and Canada at March 31, 1999.

Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at March 31, 1999, down from 2.6% at March 31, 1998.

7



Annualized net charge-offs decreased to 4.7% of average managed auto receivables for the third quarter ended March 31, 1999, from 5.3% for the third quarter of fiscal 1998.

AmeriCredit also announced that it has entered into a new $150 million structured warehouse facility with Credit Suisse First Boston as agent. This facility matures in March 2000. In addition, AmeriCredit completed a $115 million credit agreement with a group of banks led by Wells Fargo Bank, replacing the Company's $235 million bank line of credit. This facility also matures in March 2000. With the closing of these two financing agreements, AmeriCredit has increased its warehouse capacity to a total of $770 million. The credit facilities are used to finance the purchase of automobile receivables prior to securitization.

13. On May 14, 1999, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 1999. It was signed by defendant Berce. In the Form 10-Q, AmeriCredit repeated the financial results reported in the April 14, 1999 press release. The 10-Q states that the financial statements contained therein "include all adjustments . . . necessary for a fair presentation of the results of such interim periods." This statement was included in all Form 10-Q's discussed herein. The May 14, 1999, 10-Q also reported that delinquent contracts – *i.e.*, automobile receivables more than 30 days delinquent – as a percentage of average managed auto receivables, were 2.3% for the quarter.

14. Defendants knew or recklessly disregarded that the description of the Company's financial performance in the April 14, 1999, press release and the May 14, 1999, Form 10-Q was false and misleading because they fail to disclose that the results were partially the result of defendants improperly deferring loan delinquencies.

15. On August 4, 1999, AmeriCredit disseminated a press release titled "AmeriCredit Corp. Announces Its 21st Consecutive Quarterly Earnings Increase And Record Fiscal Year End Operating Results." The press release states in pertinent part:

1 \AmeriCredit\Derivative\OriginalDerivativeComplaint.doc

**AmeriCredit Corp. Announces Its 21st Consecutive Quarterly Earnings Increase And Record Fiscal Year End Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--Aug. 4, 1999--AmeriCredit Corp. (NYSE:ACF) today announced record net income of $22,477,000, or $0.33 per share, for its fourth fiscal quarter ended June 30, 1999, versus earnings of $13,901,000, or $0.21 per share, for the quarter ended June 30, 1998. On a comparative basis, net income increased 62% and earnings per share rose 57%.

For the fiscal year ended June 30, 1999, AmeriCredit reported record net income of $74,840,000, or $1.11 per share, versus earnings of $49,301,000, or $0.76 per share, for the fiscal year ended June 30, 1998, representing an increase of 52% in net income and an increase of 46% in earnings per share.

Automobile loan purchases were $888,902,000 for the fourth quarter of fiscal 1999, an increase of 58% over loan purchases of $561,079,000 for the fourth quarter of fiscal 1998. For the fiscal year ended June 30, 1999, automobile loan purchases were $2,879,796,000, 66% higher than loan purchases of $1,737,813,000 for the fiscal year ended June 30, 1998.

AmeriCredit's managed auto receivables totaled $4,105,468,000 at June 30, 1999, an increase of 78% since June 30, 1998. The Company opened 8 branch locations in its fourth fiscal quarter bringing the total number of branch locations to 176 in 41 states and Canada at June 30, 1999.

Annualized net charge-offs decreased to 4.5% of average managed auto receivables for the fourth quarter ended June 30, 1999, from 5.1% for the fourth quarter of fiscal 1998. Net charge-offs for the fiscal year ended June 30, 1999 were 4.7%, down from 5.3% for the fiscal year ended June 30, 1998.

Managed auto receivables more than sixty days delinquent were 1.8% of total managed auto receivables at June 30, 1999, down from 2.6% at June 30, 1998.

16.     In fact, defendants knew or recklessly disregarded that the August 4, 1999, press release was false and misleading because it fails to disclose that the results reported were partially achieved by defendants improperly deferring customer loan delinquencies.

17.     On September 28, 1999, AmeriCredit filed with the SEC its Form 10-K for the fiscal year ended June 30, 1999. It was signed by defendants Morris, Berce and Barrington. In

the Form 10-K, AmeriCredit repeated the financial results reported in the August 4, 1999 press release. The 10-K states, in part, that:

> Payment deferrals are at times offered to customers who have encountered temporary financial difficulty, hindering their ability to pay as contracted, and when other methods of assisting the customer in meeting the contract terms and conditions have been exhausted. A deferral allows the customer to move a delinquent payment to the end of the loan by paying a fee (approximately the interest portion of the payment deferred). The collector reviews the customer's past payment history and statistically based behavioral score and assesses the customer's desire and capacity to make future payments. Before agreeing to a deferral, the collector must also ensure that the deferment transaction complies with the Company's policies and guidelines.

18.     Defendants knew or recklessly disregarded that the September 28, 1999, Form 10-K was false and misleading because it fails to disclose that the Company was improperly deferring loan delinquencies to limit customer defaults and thus avoid activation of the delinquency triggers.

19.     On October 13, 1999, AmeriCredit announced the Company's fiscal first-quarter 1999 results in a publicly disseminated press release which states in part:

**AmeriCredit Corp. Announces Record First Quarter Operating Results And Its 22nd Consecutive Quarterly Earnings Increase**

FORT WORTH, Texas--(BUSINESS WIRE)--Oct. 13, 1999--AmeriCredit Corp. (NYSE:ACF) today announced record net income of $25,324,000, or $0.35 per share, for its first fiscal quarter ended September 30, 1999, versus earnings of $15,482,000, or $0.23 per share, for the quarter ended September 30, 1998. On a comparative basis, net income increased 64% and earnings per share rose 52%.

Automobile loan purchases were $1,031,837,000 for the first quarter of fiscal 2000, an increase of 65% over loan purchases of $624,967,000 for the first quarter of fiscal 1999. AmeriCredit's managed auto receivables totaled $4,749,085,000 at September 30, 1999, an increase of 75% since September 30, 1998. The Company opened 4 branch locations in its first fiscal quarter bringing the total number of branch locations to 180 in 41 states and Canada at September 30, 1999.

Annualized net charge-offs decreased to 4.3% of average managed auto receivables for the first quarter ended September 30, 1999, down from 4.9% for the first quarter of fiscal 1999.

Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at September 30, 1999, down from 2.8% at September 30, 1998.

Clifton H. Morris, Jr., Chairman and Chief Executive Officer of AmeriCredit, said the record quarterly performance was attributable to "continuing improvement in managing credit risk and strong loan growth, resulting in a decline in loan defaults and our first quarter of auto loan purchases in excess of $1 billion."

20.     On November 5, 1999, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended September 30, 1999. The Form 10-Q was signed by defendant Berce. In it, AmeriCredit repeated the financial results reported in the October 13, 1999 press release. The November 5, 1999, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.3% for the quarter.

21.     Defendants knew or recklessly disregarded that the results described in the October 13, 1999, press release and the November 5, 1999, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

22.     On January 13, 2000, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Second Quarter Operating Results." The press release includes a statement by defendant Morris and states in pertinent part:

**AmeriCredit Corp. Announces Second Quarter Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--Jan. 13, 2000--AMERICREDIT CORP. (NYSE:ACF) today announced net income of $19,609,000, or $0.25 per share, for its second fiscal quarter ended December 31, 1999.

Earnings for the quarter include a one-time, non-recurring charge of $10,500,000 ($8,985,000, or $0.11 per share net of income tax benefits), for the closing of

11

AmeriCredit's mortgage business. Excluding this charge, earnings for the second fiscal quarter were $28,594,000, or $0.36 per share, versus earnings of $17,376,000, or $0.26 per share, for the quarter ended December 31, 1998. On a comparative basis, excluding the charge, earnings increased 65% and earnings per share rose 38%.

For the six months ended December 31, 1999, AmeriCredit reported net income of $44,933,000, or $0.60 per share, which includes the charge for the closing of AmeriCredit's mortgage business. Excluding this charge, earnings for the six months ended December 31, 1999, were $53,918,000, or $0.72 per share, versus earnings of $32,858,000, or $0.49 per share, for the six months ended December 31, 1998. On a comparative basis, excluding the charge, this represents an increase of 64% in earnings and an increase of 47% in earnings per share.

Automobile loan purchases were $980,882,000 for the second quarter of fiscal 2000, an increase of 64% over loan purchases of $599,149,000 for the second quarter of fiscal 1999. AmeriCredit's managed auto receivables totaled $5,302,362,000 at December 31, 1999, an increase of 72% since December 31, 1998. The Company had 184 branch locations in 41 states and Canada at December 31, 1999.

Annualized net charge-offs decreased to 4.1% of average managed auto receivables for the second quarter ended December 31, 1999, down from 4.8% for the second quarter of fiscal 1999.

Managed auto receivables more than sixty days delinquent were 2.5% of total managed auto receivables at December 31, 1999, down from 2.8% at December 31, 1998.

Clifton H. Morris, Jr., Chairman and Chief Executive Officer of AmeriCredit, stated, "After significant investments in risk management tools and techniques, AmeriCredit is experiencing strong asset quality trends. At the same time, we have been able to grow the portfolio by geographic expansion and continued double digit volume increases in mature markets."

23.    On February 14, 2000, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended December 31, 1999. The Form 10-Q was signed by defendant Berce. In it, AmeriCredit repeated the financial results reported in the January 13, 2000 press release. The February 14, 2000, Form 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.5% for the quarter.

I:\AmeriCredit\Derivative\OriginalDerivativeComplaint.doc

24.     In fact, defendants knew or recklessly disregarded that the results reported in the January 13, 2000 press release and the February 14, 2000, 10-Q's were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

25.     On April 13, 2000, defendants disseminated a press release titled "AmeriCredit Corp. Reports 66% Increase in Third Quarter Earnings On Record Loan Volume of $1.2 Billion." The press release includes a statement by defendant Morris and states in pertinent part:

**AmeriCredit Corp. Reports 66% Increase in Third Quarter Earnings On Record Loan Volume of $1.2 Billion**

FORT WORTH, Texas--(BUSINESS WIRE)--April 13, 2000--AmeriCredit Corp. (NYSE:ACF) today announced record net income of $32,410,000, or $0.41 per share, for its third fiscal quarter ended March 31, 2000, versus earnings of $19,505,000, or $0.29 per share, for the quarter ended March 31, 1999. On a comparative basis, net income increased 66% and earnings per share rose 41%.

For the nine months ended March 31, 2000, AmeriCredit reported net income of $77,343,000, or $1.01 per share, including a charge for the closing of AmeriCredit's mortgage business in the second quarter. Excluding this charge, earnings for the nine months ended March 31, 2000 were $86,328,000, or $1.13 per share, versus earnings of $52,363,000, or $0.78 per share, for the nine months ended March 31, 1999. On a comparative basis, excluding the charge, this represents an increase of 65% in earnings and 45% in earnings per share.

Automobile loan purchases were a record $1,155,116,000 for the third quarter of fiscal 2000, an increase of 51% over loan purchases of $766,778,000 for the third quarter of fiscal 1999. AmeriCredit's managed auto receivables totaled $5,949,918,000 at March 31, 2000, an increase of 67% since March 31, 1999. The Company had 186 branch locations in 41 states and Canada at March 31, 2000.

Annualized net charge-offs decreased to 3.9% of average managed auto receivables for the third quarter ended March 31, 2000, down from 4.7% for the third quarter of fiscal 1999. This marks the Company's 16th consecutive quarter of stable or declining charge-off levels.

Managed auto receivables more than sixty days delinquent were 2.1% of total managed auto receivables at March 31, 2000, compared to 2.3% at March 31, 1999.

13

1 \AmeriCredit\Derivative\OriginalDerivativeComplaint doc

Clifton H. Morris, Jr., Chairman and Chief Executive Officer of AmeriCredit, stated, "We are extremely pleased that we achieved record loan origination volume while implementing increases in loan pricing during the quarter. Our increased return on managed assets during the quarter confirms our ability to sustain our margins during periods of rising interest rates." AmeriCredit's average interest rate on loans originated in the third quarter increased by approximately 70 basis points over the preceding quarterly period ended Dec. 31, 1999, more than offsetting higher funding costs.

26.     On May 15, 2000, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 1999.   The Form 10-Q was signed by defendant Berce.   In the 10-Q, AmeriCredit repeated the financial results reported in the April 13, 2000, press release.   The May 15, 2000, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.1% for the quarter.

27.     In fact, defendants knew or recklessly disregarded that the results described in the April 13, 2000, press release and the May 15, 2000, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

28.     Approximately three months later, on August 3, 2000, defendants disseminated a press release titled "AmeriCredit Corp. Reports Record Fourth Quarter and Year End Operating Results."   The August 3, 2000, press release states in pertinent part:

**AmeriCredit Corp. Reports Record Fourth Quarter and Year End Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--August 3, 2000--AmeriCredit Corp. (NYSE:ACF)

-- 4th Quarter Earnings Per Share Up 39%, to $0.46
-- 4th Quarter Net Income Up 65%, to $37.2 Million
-- Managed Portfolio Up 62% Over June 1999
-- Annualized Charge-Off Rate Declines to 3.8%

14



AmeriCredit Corp. (NYSE:ACF) today announced record net income of $37,158,000, or $0.46 per share, for its fourth fiscal quarter ended June 30, 2000, versus earnings of $22,477,000, or $0.33 per share for the same period a year earlier. On a comparative basis, net income increased 65% and earnings per share rose 39%.

For the fiscal year ended June 30, 2000, AmeriCredit reported net income of $114,501,000, or $1.48 per share, including a charge for the closing of AmeriCredit's mortgage business in the second quarter. Excluding this charge, earnings for the fiscal year ended June 30, 2000 were $123,486,000, or $1.59 per share, versus earnings of $74,840,000, or $1.11 per share, for the previous fiscal year. On a comparative basis, excluding the charge, this represents an increase of 65% in earnings and 43% in earnings per share.

Automobile loan purchases were a record $1,260,110,000 for the fourth quarter of fiscal 2000, an increase of 42% over loan purchases of $888,902,000 for the fourth quarter of fiscal 1999. For the fiscal year ended June 30, 2000, automobile loan purchases were $4,427,945,000, 54% higher than loan purchases of $2,879,796,000 for the fiscal year ended June 30, 1999. AmeriCredit's managed auto receivables totaled $6,649,981,000 at June 30, 2000, an increase of 62% since June 30, 1999. The Company had 196 branch locations in 41 states and Canada at June 30, 2000.

Annualized net charge-offs decreased to 3.8% of average managed auto receivables for the fourth quarter ended June 30, 2000, down from 4.5% for the fourth quarter of fiscal 1999. This marks the Company's 17th consecutive quarter of stable or declining charge-off levels. Net charge-offs for the fiscal year ended June 30, 2000 were 4.0%, down from 4.7% for the previous fiscal year.

Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at June 30, 2000, compared to 1.8% at June 30, 1999.

29.     On September 28, 2000, AmeriCredit filed with the SEC its Form 10-K for the fiscal year ended June 30, 2000. The Form 10-K was signed by defendants Morris, Barrington and Berce. In the fiscal 2000 10-K, AmeriCredit repeated the financial results reported in the August 3, 2000, press release. The 10-K also stated, in pertinent part:

Payment deferrals are at times offered to customers who have encountered temporary financial difficulty, hindering their ability to pay as contracted. A deferral allows the customer to move a delinquent payment to the end of the loan, usually by paying a fee (calculated in a manner specified by applicable law). The collector reviews the customer's past payment history and statistically based

15

behavioral score and assesses the customer's desire and capacity to make future payments. Before agreeing to a deferral, the collector must also ensure that the deferment transaction complies with the Company's policies and guidelines.

30.     Defendants knew or recklessly disregarded that the September 28, 2000, Form 10-K was false and misleading because it fails to disclose that the Company was improperly deferring loan delinquencies to limit customer defaults and thus avoid activation of the delinquency triggers.

31.     On October 11, 2000, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Second Quarter Operating Results." The press release includes a statement by defendant Morris and states in pertinent part:

**AmeriCredit Corp. Reports Record First Quarter Operating Results**

> 1st Quarter Earnings Per Share Up 46% to $0.51
> 1st Quarter Net Income Up 67% to $42.3 Million
> Managed Portfolio Up 57% Over September 1999
> Annualized Charge-Off Rate Declines to 3.7%

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $42,273,000, or $0.51 per share, for its first fiscal quarter ended September 30, 2000, versus earnings of $25,324,000, or $0.35 per share for the same period a year earlier. On a comparative basis, net income increased 67% and earnings per share rose 46%.

Automobile loan purchases were a record $1,406,753,000 for the first quarter of fiscal 2001, an increase of 36% over loan purchases of $1,031,837,000 for the first quarter of fiscal 2000. AmeriCredit's managed auto receivables totaled $7,448,553,000 at September 30, 2000, an increase of 57% since September 30, 1999. The Company had 198 branch locations in 41 states and Canada at September 30, 2000.

Annualized net charge-offs decreased to 3.7% of average managed auto receivables for the first quarter ended September 30, 2000, down from 4.3% for the first quarter of fiscal 2000. This marks the Company's 18th consecutive quarter of stable or declining charge-off levels.

16

Managed auto receivables more than sixty days delinquent were 2.4% of total managed auto receivables at September 30, 2000, compared to 2.3% at September 30, 1999.

32.     On November 14, 2000, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended September 30, 2000. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the October 11, 2000, press release. The November 14, 2000, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.4% for the quarter.

33.     In fact, defendants knew or recklessly disregarded that the results reported in the October 11, 2000, press release and the November 14, 2000, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

34.     On January 10, 2001, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Second Quarter Operating Results." This press release states that the Company's second quarter earnings were $0.57 per share, compared with earnings of $0.25 per share for the same period a year earlier. The press release includes a statement by defendant Morris and states in pertinent part:

**Americredit Corp. Reports Record Second Quarter Operating Results**

> 2nd Quarter Earnings Per Share Up 58% to $0.57
> 2nd Quarter Net Income Up 69% to $48.4 Million
> Managed Portfolio Up 55% Over December 1999
> Annualized Charge-Off Rate Declines to 3.6%

> AMERICREDIT CORP. (NYSE: ACF) today announced record net income of $48,442,000, or $0.57 per share, for its second fiscal quarter ended December 31, 2000, versus earnings of $19,609,000, or $0.25 per share for the same period a year earlier. Earnings for the second quarter of the prior year include a charge of $10,500,000 ($8,985,000, or $0.11 per share net of income tax benefits) for the

17

closing of AmeriCredit's mortgage business. On a comparative basis, excluding the charge, earnings increased 69% and earnings per share rose 58%.

For the six months ended December 31, 2000, AmeriCredit reported net income of $90,715,000, or $1.08 per share, versus earnings of $44,933,000, or $0.60 per share, for the six months ended December 31, 1999. Excluding the charge, earnings for the six months ended December 31, 1999 were $53,918,000, or $0.72 per share. On a comparative basis, excluding the charge, earnings increased 68% and earnings per share rose 50%.

Automobile loan purchases were $1,380,986,000 for the second quarter of fiscal 2001, an increase of 41% over loan purchases of $980,882,000 for the second quarter of fiscal 2000. AmeriCredit's managed auto receivables totaled $8,225,509,000 at December 31, 2000, an increase of 55% since December 31, 1999. The Company had 202 branch locations in 41 states and Canada at December 31, 2000.

Annualized net charge-offs decreased to 3.6% of average managed auto receivables for the second quarter ended December 31, 2000, compared to 4.1% for the second quarter of fiscal 2000. Managed auto receivables more than sixty days delinquent were 2.7% of total managed auto receivables at December 31, 2000, compared to 2.5% at December 31, 1999.

35.    On February 14, 2001, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended December 31, 2000. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the January 10, 2001, press release. The February 14, 2001, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.7% for the quarter.

36.    In fact, defendants knew or recklessly disregarded that the results reported in the January 10, 2001, press release and the February 14, 2001, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

37.    On April 11, 2001, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Record Third Quarter Operating Results." This press release states that the

18

Company's third quarter earnings were $0.70 per share compared with earnings of $0.41 per share in the third quarter of 2000. The press release includes a statement by defendant Morris and states in pertinent part:

### AmeriCredit Reports Record Third Quarter Operating Results

3rd Quarter Earnings Per Share Up 71% to $0.70
3rd Quarter Net Income Up 86% to $60.4 Million
Managed Portfolio Up 53% Over March 2000
Annualized Charge-Off Rate Remains 3.6%

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $60,430,000, or $0.70 per share, for its third fiscal quarter ended March 31, 2001, versus earnings of $32,410,000, or $0.41 per share for the same period a year earlier. On a comparative basis, earnings increased 86% and earnings per share rose 71%.

For the nine months ended March 31, 2001, AmeriCredit reported net income of $151,145,000, or $1.78 per share, versus earnings of $77,343,000, or $1.01 per share, for the nine months ended March 31, 2000. Excluding the charge for the closing of AmeriCredit's mortgage business last year, earnings for the nine months ended March 31, 2000 were $86,328,000, or $1.13 per share. On a comparative basis, excluding the charge, earnings increased 75% and earnings per share rose 58%.

Automobile loan purchases were $1,653,200,000 for the third quarter of fiscal 2001, an increase of 43% over loan purchases of $1,155,116,000 for the third quarter of fiscal 2000. AmeriCredit's managed auto receivables totaled $9,101,254,000 at March 31, 2001, an increase of 53% since March 31, 2000. The Company had 217 branch locations throughout the United States and Canada at March 31, 2001.

Annualized net charge-offs were 3.6% of average managed auto receivables for the third quarter, compared to 3.9% for the third quarter of fiscal 2000. Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at March 31, 2001, compared to 2.1% at March 31, 2000.

38.    On May 15, 2001, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 2001. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the April 11, 2001, press release. The

May 15, 2001, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.3% for the quarter.

39.    In fact, defendants knew or recklessly disregarded that the results reported in the April 11, 2001, press release and the May 15, 2001, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

40.    On August 7, 2001, AmeriCredit issued a press release titled, "AmeriCredit Reports Record Fourth Quarter and Fiscal Year End Operating Results." This press release states that the Company's fourth fiscal quarter earnings were $0.81, compared with earnings of $0.46 per share for the same period a year earlier. The press release includes a statement by defendant Morris and states in pertinent part:

> **AmeriCredit Reports Record Fourth Quarter and Fiscal Year End Operating Results**
>
> 4th Quarter Earnings Per Share Up 76% to $0.81
> 4th Quarter Net Income Up 93% to $71.7 Million
> Managed Portfolio Up 53% Over June 2000 to $10.2 billion
> Annualized Charge-Off Rate Remains 3.6%
>
> AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $71,707,000, or $0.81 per share, for its fourth fiscal quarter ended June 30, 2001, versus earnings of $37,158,000, or $0.46 per share for the same period a year earlier. On a comparative basis, earnings increased 93% and earnings per share rose 76%.
>
> For the fiscal year ended June 30, 2001, AmeriCredit reported net income of $222,852,000, or $2.60 per share, versus earnings of $114,501,000, or $1.48 per share, for the fiscal year ended June 30, 2000. Excluding the charge for the closing of AmeriCredit's mortgage business last year, earnings for the fiscal year ended June 30, 2000 were $123,486,000, or $1.59 per share. On a comparative basis, excluding the charge, earnings increased 80% and earnings per share rose 64%.

Automobile loan purchases were $1,937,713,000 for the fourth quarter of fiscal 2001, an increase of 54% over loan purchases of $1,260,110,000 for the fourth quarter of fiscal 2000. For the fiscal year ended June 30, 2001, automobile loan purchases were $6,378,652,000, 44% higher than loan purchases of $4,427,945,000 for the fiscal year ended June 30, 2000. AmeriCredit's managed auto receivables totaled $10,203,746,000 at June 30, 2001, an increase of 53% since June 30, 2000. The Company had 232 branch locations throughout the United States and Canada at June 30, 2001.

Annualized net charge-offs were 3.6% of average managed auto receivables for the fourth quarter, compared to 3.8% for the fourth quarter of fiscal 2000. Managed auto receivables more than sixty days delinquent were 2.5% of total managed auto receivables at June 30, 2001, compared to 2.3% at June 30, 2000.

41.     In fact, defendants knew or recklessly disregarded that these results were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

42.     On September 25, 2001, AmeriCredit filed with the SEC its Form 10-K for the year ended June 30, 2001. The Form 10-K was signed by defendants Morris, Barrington and Berce. In the 10-K, AmeriCredit repeated the financial results reported in the August 7, 2001, press release. The September 25, 2001, 10-K also stated, in pertinent part:

Payment deferrals are at times offered to customers who have encountered temporary financial difficulty, hindering their ability to pay as contracted. A deferral allows the customer to move a delinquent payment to the end of the loan, usually by paying a fee (calculated in a manner specified by applicable law). The collector reviews the customer's past payment history and statistically based behavioral score and assesses the customer's desire and capacity to make future payments. Before agreeing to a deferral, the collector also considers whether the deferment transaction complies with the Company's policies and guidelines.

43.     Defendants knew or recklessly disregarded that the September 25, 2001, Form 10-K was false and misleading because it fails to disclose that the Company was improperly deferring loan delinquencies to limit customer defaults and thus avoid activation of the delinquency triggers.

21

44.     On October 10, 2001, defendants disseminated a press release touting "record first

quarter" fiscal 2002 operating results.  The press release states in pertinent part:

**AmeriCredit Reports Record First Quarter 2002 Operating Results**

-- 1st Quarter Earnings Per Share Up 73% to $0.88
-- 1st Quarter Net Income Up 86% to $78.7 Million
-- Quarterly Loan Originations Up 45% to $2.0 Billion
-- Managed Portfolio Up 52% to $11.3 Billion

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of
$78,737,000, or $0.88 per share, for its first fiscal quarter ended September 30,
2001, versus earnings of $42,273,000, or $0.51 per share, for the same period a
year earlier. On a comparative basis, net income increased 86% and earnings per
share rose 73%.

Automobile loan purchases were $2,035,219,000 for the first quarter of fiscal
2002, an increase of 45% over loan purchases of $1,406,753,000 for the first
quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled
$11,325,476,000 at September 30, 2001, an increase of 52% since September 30,
2000. The Company had 248 branch locations throughout the United States and
Canada at September 30, 2001.

Annualized net charge-offs were 3.8% of average managed auto receivables for
the first quarter, compared to 3.7% for the first quarter of fiscal 2001. Managed
auto receivables more than sixty days delinquent were 3.1% of total managed auto
receivables at September 30, 2001, compared to 2.4% at September 30, 2000.

45.     On November 14, 2001, AmeriCredit filed with the SEC its Form 10-Q for the

quarter ended September 30, 2001.  The Form 10-Q was signed by defendant Berce.  In the 10-Q,

AmeriCredit repeated the financial results reported in the October 10, 2001, press release.  The

November 14, 2001, 10-Q also reported that delinquent contracts as a percentage of average

managed auto receivables were 3.1% for the quarter.

46.     In fact, defendants knew or recklessly disregarded that the results reported in the

October 10, 2001, press release and the November 14, 2001, Form 10-Q were false and

misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

47. On January 10, 2002, AmeriCredit disseminated a press release titled "AmeriCredit Reports Record Second Quarter Operating Results, Meets Earnings Expectations." The press release states in pertinent part:

### AmeriCredit Reports Record Second Quarter Operating Results, Meets Earnings Expectations

2nd Quarter Earnings Per Share Up 60% to $0.91
2nd Quarter Net Income Up 66% to $80.6 Million
Quarterly Loan Originations Up 47% to $2.0 Billion
Managed Portfolio Up 51% to $12.4 Billion

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $80.6 million, or $0.91 per share, for its second fiscal quarter ended December 31, 2001, versus earnings of $48.4 million, or $0.57 per share, for the same period a year earlier. On a comparative basis, net income increased 66% and earnings per share rose 60%.

For the six months ended December 31, 2001, AmeriCredit reported net income of $159.3 million, or $1.79 per share, versus earnings of $90.7 million, or $1.08 per share, for the six months ended December 31, 2000. On a comparative basis, earnings increased 76% and earnings per share rose 66%.

Automobile loan purchases were $2.04 billion for the second quarter of fiscal 2002, an increase of 47% over loan purchases of $1.38 billion for the second quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled $12.38 billion at December 31, 2001, an increase of 51% since December 31, 2000. The Company had 254 branch locations throughout the United States and Canada at December 31, 2001.

Annualized net charge-offs were 4.3% of average managed auto receivables for the second quarter of fiscal 2002 and in line with the Company's guidance. This compares to net charge-offs of 3.6% for the second quarter of fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.8% of total managed auto receivables at December 31, 2001, compared to 2.7% at December 31, 2000.

48.    On February 14, 2002, AmeriCredit filed with the SEC its Form 10-Q for the

quarter ended December 31, 2001. The Form 10-Q was signed by defendant Berce. In the 10-Q,

AmeriCredit repeated the financial results reported in the January 10, 2002, press release. The

February 14, 2002, 10-Q also reported that delinquent contracts as a percentage of average

managed auto receivables were 3.8% for the quarter.

49.    In fact, defendants knew or recklessly disregarded that the results reported in the

January 10, 2002, press release and the February 14, 2002, Form 10-Q were false and misleading

because the Company's financial performance was artificially inflated by improperly deferring

loan delinquencies.

50.    On April 15, 2002, defendants disseminated a press release titled "AmeriCredit

Reports Record Third Quarter Operating Results." The press release includes a statement by

defendant Barrington and states in pertinent part:

**AmeriCredit Reports Record Third Quarter Operating Results**

3rd Quarter Earnings Per Share Up 46% to $1.02
3rd Quarter Net Income Up 52% to $91.6 Million
Quarterly Loan Originations Up 47% to $2.4 Billion
Managed Portfolio Up 50% to $13.6 Billion

AMERICREDIT CORP. (NYSE:ACF - news) today announced record net income
of $91.6 million, or $1.02 per share, for its third fiscal quarter ended March 31,
2002, versus earnings of $60.4 million, or $0.70 per share, for the same period a
year earlier. On a comparative basis, net income increased 52% and earnings per
share rose 46%.

For the nine months ended March 31, 2002, AmeriCredit reported net income of
$251.0 million, or $2.81 per share, versus earnings of $151.1 million, or $1.78 per
share, for the nine months ended March 31, 2001. On a comparative basis, net
income increased 66% and earnings per share rose 58%.

Automobile loan purchases were $2.43 billion for the third quarter of fiscal 2002,
an increase of 47% over loan purchases of $1.65 billion for the third quarter of
fiscal 2001. AmeriCredit's managed auto receivables totaled $13.63 billion at

March 31, 2002, an increase of 50% since March 31, 2001. The Company had 252 branch locations throughout the United States and Canada at March 31, 2002.

Annualized net charge-offs were 4.8% of average managed auto receivables for the third quarter of fiscal 2002. This compares to net charge-offs of 4.3% last quarter and 3.6% for the third quarter of fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.1% of total managed auto receivables at March 31, 2002, compared to 3.8% at December 31, 2001 and 2.3% at March 31, 2001.

"The past nine months have been both challenging and very rewarding for AmeriCredit," says Michael Barrington, chief executive officer of AmeriCredit. "We have long believed our business model has the flexibility to withstand various economic conditions while delivering industry-leading growth and profitability. Our actual performance over the past few quarters has demonstrated this to be so."

51.    On May 15, 2002, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 2002.    The Form 10-Q was signed by defendant Berce.    In the 10-Q, AmeriCredit repeated the financial results reported in the April 15, 2002, press release.  The May 15, 2002, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 3.1% for the quarter.

52.    In fact, defendants knew or recklessly disregarded that the results reported in the April 15, 2002, press release and the May 15, 2002, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

53.    On August 6, 2002, defendants disseminated a press release titled "AmeriCredit Reports Record Fourth Quarter and Fiscal Year Operating Results." The press release includes a statement by defendant Barrington and states in pertinent part:

25

**AmeriCredit Reports Record Fourth Quarter and Fiscal Year Operating Results**

4th Quarter Earnings Per Share Up 31% to $1.06 4th Quarter Net Income Up 35% to $96.5 Million Quarterly Loan Originations Up 25% to $2.4 Billion

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $96.5 million, or $1.06 per share, for its fourth fiscal quarter ended June 30, 2002, versus earnings of $71.7 million, or $0.81 per share, for the same period a year earlier. On a comparative basis, net income increased 35% and earnings per share rose 31%.

For the fiscal year ended June 30, 2002, AmeriCredit reported net income of $347.5 million, or $3.87 per share, versus earnings of $222.9 million, or $2.60 per share, for the fiscal year ended June 30, 2001. On a comparative basis, net income increased 56% and earnings per share rose 49%.

Automobile loan purchases were $2.43 billion for the fourth quarter of fiscal 2002, an increase of 25% over loan purchases of $1.94 billion for the fourth quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled $14.76 billion at June 30, 2002, an increase of 45% since June 30, 2001.

Annualized net charge-offs were 5.2% of average managed auto receivables for the fourth quarter of fiscal 2002, consistent with previous guidance. This compares to net charge-offs of 4.8% last quarter and 3.6% for the fourth quarter of fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.3% of total managed auto receivables at June 30, 2002, compared to 2.5% at June 30, 2001.

"The June quarter capped another successful fiscal year at AmeriCredit," said Michael R. Barrington, chief executive officer of AmeriCredit Corp. "Our plan for the quarter was to moderate our growth rate and maintain our solid financial results, and we met those goals. We grew loan volume by 25% and net income by 35%, and I couldn't be more pleased with these accomplishments."

54.    In fact, defendants knew or recklessly disregarded that these results were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

26

## THE TRUTH IS REVEALED

55.     On September 16, 2002, after the markets had closed, AmeriCredit issued a press release disclosing that the Company would raise its delinquency trigger levels and change its method of accounting for its loan portfolio. The press release includes a statement by defendant Barrington and states in pertinent part:

> **AmeriCredit Reaches Agreement Regarding Securitization Triggers, Will Move Future Securitizations to On-balance Sheet Financing Structure, and Plans to Add Three Independent Directors**
>
> FORT WORTH, Texas--(BUSINESS WIRE)--Sept. 16, 2002--AMERICREDIT CORP. (NYSE:ACF) announced today it has reached an agreement with Financial Security Assurance (FSA), the Company's bond insurance guarantor, to raise delinquency trigger levels in its securitizations.
>
> The agreement with FSA provides for an increase in delinquency triggers to a level in excess of the Company's current forecast of pool performance for the six monthly reporting periods from September 2002 through February 2003. This reduces the likelihood of an increase in credit enhancement requirements due to delinquency triggers for all of its outstanding securitizations.
>
> In consideration for raising delinquency triggers, FSA will receive warrants to purchase 1,287,691 shares of common stock, which are exercisable for five years at a 20% premium above market plus a 2.5 basis point increase in insurance fees. AmeriCredit has also announced it will structure its future securitization transactions as secured financings, which do not require the recognition of a gain-on-sale.
>
> Accordingly, auto receivables securitized in the future will remain on the Company's balance sheet. Net earnings on its receivables will be recognized over the life of the receivables as finance charge and fee income, less related funding costs and a provision for losses. The change in securitization structure will have no impact on the Company's funding procedures, business model or cash flow.
>
> "Middle market automobile finance can be a complex business," said AmeriCredit CEO Mike Barrington, "and some of our stakeholders have told us they don't fully understand the accounting for our business due to the use of gain-on-sale. So we've made the decision to move to on-balance sheet securitizations to make it clearer for all our stakeholders to understand our business and assess our financial results over time."



Management has indicated it plans to grow its managed loan portfolio approximately 15% annually over time. Due to the change in how future securitization transactions will be structured, the Company's earnings guidance is being revised. The new projections are as follows:

| ($ millions) | 3 mos. ended 9/30/02 | 3 mos. ended 12/31/02 | 12 mos. ended 6/30/03 | 12 mos. ended 12/31/03 |
|---|---|---|---|---|
| Net income | $55 - 60 | $(5) - (10) | $80 - 90 | $160 - 170 |

"AmeriCredit's business model is not changing. What is changing is the way we structure our securitizations, and therefore how we recognize earnings in accordance with Generally Accepted Accounting Principles. This change is consistent with our practice of providing clear and complete information to all our stakeholders," Barrington said.

56.     The next day, September 17, 2002, AmeriCredit filed its Form 10-K for the fiscal year ended June 30, 2002, with the Securities and Exchange Commission. The Form 10-K disclosed that AmeriCredit will need "at least $150 million of additional external capital" and secure other sources of financing "in order to fund its liquidity needs in fiscal 2003."

57.     Also on September 17, 2002, CSFB issued an analyst report concerning AmeriCredit titled "Sweeping Financial Changes, Crimps near Term Valuation," which downgraded AmeriCredit stock from "Outperform" to "Neutral." The report stated, in part, that "AmeriCredit announced sweeping changes to its financial structure after the close yesterday, including a) structuring future securitizations as financings b) raising $500 million of common equity and c) **renegotiating its delinquency triggers on its existing deals**." (Emphasis added.) That same day, Wachovia Securities published an analyst report noting that AmeriCredit's restructuring included an agreement with Financial Security Assistance, the Company's bond insurance guarantor, "to raise delinquency trigger levels in its securitizations for the six monthly reporting periods from September 2002 through February 2003."

28

58.    On the same day, September 17, 2002, a subsequent article published by TheStreet.com, titled "Wall Street Gapes at AmeriCredit Wreck," noted a precipitous, thirty-percent decline in AmeriCredit's stock price and stated, in part, that "**[t]he Fort Worth, Texas, lender to people with poor credit histories has been grappling with rising loan defaults over the past year.** But credit problems appear to have gotten so bad that the once fast-growing company wants to take drastic measures to shore up its liquidity...**AmeriCredit's critics argue that it increases deferments to keep delinquency numbers down artificially**, a charge the company has denied in the past." (Emphasis added.)

59.    Investor reaction to the news of AmeriCredit's liquidity and loan portfolio problems was sharply negative.  By the close of trading on September 17, 2002, AmeriCredit's stock price had plunged thirty-eight percent (38%) from the previous day's close as a result of this news.

60.    Approximately four months later, on January 16, 2002 – one day after the end of the Class Period – AmeriCredit issued a press release announcing the Company's financial results, including an $0.18 loss per share, for the second fiscal quarter ended September 30, 2002.  The press release quotes defendants Barrington and Berce, and states in pertinent part:

**AmeriCredit Reports Second Quarter Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--Jan. 16, 2003--AmeriCredit Corp. (NYSE:ACF) today announced a net loss of $27.6 million, or $0.18 per share, for its second fiscal quarter ended December 31, 2002, versus earnings of $80.6 million, or $0.91 per share, for the same period a year earlier. This was the first quarter that AmeriCredit structured its securitization transactions as secured financings, which did not require the recognition of gain-on-sale revenue. This net loss also included a $46.6 million pretax impairment of the interest-only receivable from prior securitization transactions.

29

For the six months ended December 31, 2002, AmeriCredit reported net income of $42.6 million, or $0.36 per share, versus earnings of $159.3 million, or $1.79 per share, for the six months ended December 31, 2001.

Automobile loan purchases were $1.89 billion for the second quarter of fiscal 2003, down 7% from loan purchases of $2.04 billion for the second quarter of fiscal 2002. AmeriCredit's managed auto receivables totaled $16.2 billion at December 31, 2002.

Annualized net charge-offs were 5.8% of average managed auto receivables for the second quarter of fiscal 2003. This compares to net charge-offs of 5.3% last quarter and 4.3% for the second quarter of fiscal 2002. Vehicles pending sale at auction totaled 1.4% of the portfolio at December 31, 2002, up from 1.1% at September 30, 2002. Managed auto receivables more than 60 days delinquent were 4.1% of total managed auto receivables at December 31, 2002, compared to 3.8% at December 31, 2001.

"We're seeing continued weakness in recovery values on repossessed vehicles and in the overall economy, causing increases in both loss severity and frequency. Therefore, we are projecting that credit losses will rise during the first half of 2003," said AmeriCredit Chief Executive Officer Michael R. Barrington. "We reduced both loan origination volume and operating expenses in the December quarter to align loan growth with available liquidity. We are committed to maintaining this balance going forward."

***

Pursuant to Regulation FD, the Company provides its expectations regarding future business trends to the public via a press release or 8-K filing. The Company anticipates some risks and uncertainties with its guidance as it continues to align loan growth with available liquidity.

| ($ millions) | 12 mos. ending 6/30/03 | 12 mos. ending 12/31/03 |
|---|---|---|
| Net income forecast | $70 - 80 | $100 - 125 |

"AmeriCredit expects to be profitable in 2003," said AmeriCredit Chief Financial Officer Daniel E. Berce. "We are revising our guidance to take into account possible changes in the scale of our business given the continued weakness in the overall economy and our projected increase in credit losses in 2003."

61. Investor reaction to the January 16, 2003, news of the Company's dismal financial performance and rising credit losses caused AmeriCredit's stock to plummet a shocking 54% from the previous day – January 15, 2003, the last day of the Class Period. The same day that

30

I \AmeriCredit\Derivative\OriginalDerivativeComplaint.doc

the Company released it second quarter financial results, <u>Bloomberg News</u> published an article titled "AmeriCredit has $27.6 Mln 2nd-Qtr Loss; Shares Fall," noting that the Company's stock **"fell 54 percent after the provider of auto loans reported a net loss that was triple what analysts expected because more borrowers defaulted on loans"** (emphasis added). Also in the <u>Bloomberg News</u> article, Sean Egan, managing director of Egan-Jones Ratings Co., noted that the second quarter loss "might be the tip of the iceberg if delinquencies are going to increase. ..."

62. AmeriCredit and its shareholders have fared no better in subsequent news releases. On February 12, 2003, AmeriCredit was forced to revise its previously announced net loss for its December quarter and institute a restructuring plan that will cut 20 percent of the Company's work force, about 1,000 jobs, resulting in a $40 million to $50 million charge. Although having stunned the market on January 16, 2003 with its announcement of a net loss of $27.6 million, or 18 cents a share for the second quarter ended December 31, 2002, the net loss had, within less than a month, ballooned to $44.7 million or 29 cents a share. AmeriCredit also announced that it would be forced to slash its loan origination volume by $750 million per quarter by June, 2003; a strong indication of future liquidity problems due to management's prior errors.

63. Disclosure of problems did not stop on February 12, 2003. On February 14, 2003, Defendant Berce was forced to concede during a telephone conference that Financial Security Assurance, Inc. ("FSA"), the financial company that historically guaranteed payment on AmeriCredit's securitization transactions, would not be the only company providing "credit enhancements" to AmeriCredit's securitization. In fact, on February 18, 2003, AmeriCredit was forced to concede that FSA was "unlikely" to provide **any** insurance for the Company's securitizations for the first half of 2003. AmeriCredit has now also acknowledged that it is

31

required to enhance the levels of credit on future securitization transactions, requiring the use of

additional liquidity to support its securitization program.   If the Company cannot execute

securitization transactions on a regular basis, it will not have enough cash to meet its liquidity

needs.  The Company is also actively negotiating to sell other assets to raise cash.

64.     Institutional investors and financial assurance companies, such as FSA, have lost

confidence and faith in AmeriCredit due in part to defendants' actions.  Putnam Investments

recently announced that it cut its holdings in AmeriCredit from 4.24% to 0.9%.   Putnam

Investments, an institutional investor, now owns about 1.4 million shares of AmeriCredit, down

from 6.5 million shares.

65.     The Individual Defendants owed a fiduciary duty to AmeriCredit to supervise the

business affairs of the Company and its press releases and public filings to ensure that they were

truthful and accurate and that they conformed with federal and state law.   The Individual

Defendants breached their fiduciary duty by failing to properly supervise and monitor

AmeriCredit's accounting practices and the adequacy of its internal financial controls and audits

and by allowing misleading statements and filings to be issued and made.

66.     The Individual Defendants have engaged, knowingly or recklessly, in a sustained

and systematic failure over the course of the Relevant Period to exercise their oversight

responsibilities to ensure that AmeriCredit complied with Federal and State Laws, rules and

regulations and with GAAP to ensure the integrity of its financial reporting.

67.     As a result of the Individual Defendants' breaches, AmeriCredit is the subject of

numerous securities fraud class action lawsuits by defrauded investors, has lost a huge amount of

its market capitalization, has had its reputation in the business community irreparably tarnished,

I \AmenCredit\Derivative\OriginalDerivativeComplaint doc

must now pay additional money to obtain the same credit availability, paid excessive compensation to defendants Morris, Berce and Barrington and has thus been damaged.

## DEMAND FUTILITY

68.    Plaintiff has not made a demand on the AmeriCredit Board of Directors to prosecute the claims.  Such demand is futile, and thus excused, for the following reasons:

(a)    The Individual Defendants constitute a controlling group of AmeriCredit's Board of Directors and represent the top executive officers of AmeriCredit.   There is a substantial likelihood that the Individual Defendants are personally liable to AmeriCredit for the damages it has sustained and will sustain in the future as a result of the wrongs described above; and

(b)    As a consequence, each Individual Defendant is in an irreconcilable conflict of interest regarding the prosecution of this action and has a personal pecuniary interest that would be adversely affected if the claims herein were pursued.  Accordingly, the Individual Defendants cannot exercise the requisite independence necessary to consider a pre-suit demand impartially and in good faith.

69.    Plaintiff has no adequate remedy at law.

**WHEREFORE**, plaintiff demands judgment as follows:

A.    Directing defendants to account to and repay to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Requiring defendants to return to AmeriCredit all salaries, payments and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to AmeriCredit, or aided and abetted the same.

33

C.    Directing the Individual Defendants to establish and maintain effective compliance programs to ensure that AmeriCredit's affiliates and employees do not engage in wrongful and illegal practices;

D.    Directing all defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of defendants' culpable conduct;

E.    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

F.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED: February 2⅟, 2003                    Respectfully submitted,

FEDERMAN & SHERWOOD
William B. Federman, TX Bar No. 00794935
120 North Robinson, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/FAX: (405) 239-2112
- and -
2926 Maple Avenue, Suite 200
Dallas, TX 75201
(214) 696-1100

**ATTORNEY IN CHARGE**

Marc S. Henzel, Esq.
Law Offices of Marc S. Henzel
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
(610) 660-8000/FAX: (610) 660-8080

I:\AmeriCredit\Derivative\OriginalDerivativeComplaint.doc

## VERIFICATION

I, _Mildred Rosenthal_ have reviewed the Derivative Complaint to be filed in this matter and verify the content therein to the best of my belief. I further authorize filing of same.

Date: _2/24/03_

I:\AmeriCredit\Derivative\OriginalDerivativeComplaint.doc